# In the United States Court of Federal Claims

**No. 11-124C**
**(Filed Under Seal: April 22, 2011)**
**(Reissued:  May 4, 2011)[1]**
**(Bid Protest)**

* * * * * * * * * * * * * * * * * * * * * * * * * *

**PATRIOT TAXIWAY INDUSTRIES, INC.,** *

                                          *

               **Plaintiff,**           *          **Post-Award Bid Protest;**
                                          *          **Motion for Judgment on the AR;**
          **v.**                          *          **Evaluation of Past and Present**
                                          *          **Performance; Price**
                                          *          **Reasonableness; Meaningful**
**THE UNITED STATES,**                 *          **Discussions; Permanent**
                                          *          **Injunction; Success on the**
               **Defendant,**           *          **Merits.**
                                          *
          **and**                        *
                                          *
**TACTICAL LIGHTING SYSTEMS, INC.,** *
                                          *
               **Intervenor.**          *

* * * * * * * * * * * * * * * * * * * * * * * * * *

        Jon W. van Horne, Law Office of Jon van Horne, Esq., 18222 Flower Hill Way, Suite 112, Gaithersburg, MD, for Plaintiff.

        Alexander V. Sverdlov, U.S. Department of Justice -- Civil Division, P.O. Box 480, Ben Franklin Station, Washington, D.C., for Defendant.

        James H. Roberts, III, Van Scoyoc Kelly PLLC, 101 Constitution Ave., N.W., Suite 665 East, Washington, D.C., for Intervenor.

---

        [1]  This opinion was issued under seal on April 22, 2011.  The Court invited the parties to submit proposed redactions by May 2, 2011.  The Opinion issued today incorporates Defendant's proposed redactions.  This redacted material is represented by brackets [ ].

---

## OPINION AND ORDER

---

**WILLIAMS**, Judge.

In this post-award bid protest, Patriot Taxiway Industries, Inc. ("Patriot") protests the award of a contract by the Department of the Air Force ("Air Force") to Tactical Lighting Systems, Inc. ("Tactical"), pursuant to Request for Proposals ("RFP") No. FA8533-10-R-25009. The RFP contemplated a contract for the design, testing, development, and production of a portable airfield lighting system. Patriot claims that the Air Force improperly evaluated Tactical's and Patriot's past and present performance information by improperly aggregating contracts, considering future performance, not properly documenting its determination of performance confidence assessment ratings, and treating Patriot and Tactical unequally. Plaintiff also alleges that the Air Force failed to conduct a proper price reasonableness analysis and engaged in misleading discussions with Patriot regarding pricing. As such, Patriot seeks a reevaluation of the technically acceptable proposals.

Upon consideration of the Administrative Record ("AR") and the motion papers, the Court concludes that Patriot has not proven that the Air Force committed a prejudicial violation of law or deprived Patriot of a fair opportunity to compete for the contract. As such, Defendant's and Tactical's motions for judgment on the AR are granted, and Patriot's motion for a permanent injunction is denied.

### Findings of Fact[2]

#### The Solicitation

The Air Force issued the RFP on March 2, 2010, as a small business set-aside. AR 9, 12. Amendments to the RFP were issued throughout March and April of 2010. The solicitation contemplated the design and production of a portable airfield lighting system known as Expeditionary Airfield Lighting Systems II ("EALS II"), which provides visual cues necessary for incoming aircraft to approach, land, and maneuver at night or in low-visibility conditions. The Air Force anticipated the award of a firm fixed-price, indefinite-delivery, requirements-type contract for a two-year base term and four one-year options. AR 14, 414-15. The Air Force estimated the total contract value to be $44.1 million and envisioned that 24,428 airfield light fixtures would be delivered under the contract.

The procurement was conducted as a "Technically Acceptable - Performance - Price Tradeoff" best-value source selection procedure. The RFP explained the source selection procedure as follows:

---

[2] These findings of fact are derived from the AR and exhibits to the motion papers.

(a)  This acquisition will utilize the Technically Acceptable Performance-Price Tradeoff (TA-PPT) source selection procedure to make an integrated assessment for a best value award decision.  A decision on the technical acceptability of each offeror's proposal will be made.  For those offerors who are determined to be technically acceptable, tradeoffs will be made between past and present performance and price.  Past and present performance is considered <u>significantly more important than price</u> though price remains an important consideration in the best value award decision.

(b)  While the Government will strive for maximum objectivity, the tradeoff process, by its nature, is subjective; therefore, professional judgment is implicit throughout the selection process. . . .  <u>Award will be made to one responsible offeror whose proposal conforms to all solicitation requirements</u> . . . <u>and provides the best value to the Government</u> . . . .

AR 80; <u>see also</u> AR 369, 468.  Under this process, the Air Force first evaluated proposals for technical acceptability and then conducted a best value tradeoff analysis of the technically acceptable proposals based on past and present performance and price.  AR 468.

To assist the Air Force in evaluating past and present performance, each offeror was to submit a FACTS Sheet, describing three "active or completed [contracts] (with preferably at least one year of performance history)" within the past six years that the offeror considered to be relevant in demonstrating its ability to perform the EALS II contract.  AR 78-80, 412.  Each offeror was also required to submit the same type of past and present performance information for its "critical subcontractor," defined as an entity that would be responsible for performing at least 25 percent of the production of light fixtures.  <u>See</u> AR 367, 370.

The RFP explained that the Air Force would consider "[t]he recency and relevancy of the [past and present performance] information, the source of the information, context of the data, and general trends in the contractor's performance."  AR 81, 370.  Based on its assessment, which would include analyzing the degree to which the effort involved the same "magnitude of work and complexities" as the EALS II contract, the Air Force would assign each proposal a rating of "very relevant," "relevant," "somewhat relevant," or "not relevant."  AR 81-82.  The RFP made clear that the "'magnitude of effort and complexities' . . . denote[d] not only technical features and characteristics but also programmatic and logistical considerations, including but not limited to quantities produced, dollar values, type of contract, length of effort, testing requirements, type and complexity of data contractually required of the offeror, etc."  AR 82.

The RFP defined each relevancy rating as follows:

| RELEVANCY RATING | DEFINITION |
|---|---|
| **VERY RELEVANT** | A present and/or past performance effort that involved the production, testing, and installation of no less than 200 Light Emitting Diode (LED) fixtures in a commercial or military airfield, and such effort involved essentially the same magnitude of work and complexities that this solicitation requires. |
| **RELEVANT** | A present and/or past performance effort that involved the production and installation of no less than 100 LED or incandescent light fixtures in a commercial or military airfield or marine navigation application, and such effort involved much of the magnitude of work and complexities that this solicitation requires. |
| **SOMEWHAT RELEVANT** | A present and/or past performance effort that involved the production and installation of no less than 100 LED or incandescent light fixtures or other type [of] light fixtures powered by alternate energy sources including but not limited to solar, fuel cells, and wind in a commercial or military airfield, marine navigation, or industrial complex, and such efforts involved some of the magnitude of work and complexities that this solicitation requires. |
| **NOT RELEVANT** | Present and/or past performance efforts did not involve any of the magnitude of effort and complexities [that] this solicitation requires. |

AR 81-82.

For the purpose of evaluating the relevancy of past and present efforts, the RFP permitted the Air Force to aggregate contracts.  AR 82.  Specifically, the RFP stated:

> The Government may consider an offeror's contracts in the aggregate in determining relevancy should the offeror's present and past performance lend itself to this approach.  That is, an offeror's three contracts may by definition represent only a rating less than very relevant when each contract is considered as a stand-alone effort.  However, when these contracts are performed concurrently (in whole or in part) and are assessed in the aggregate, the work may more accurately reflect a higher relevancy rating.  In this situation, work performed in the aggregate will be considered in the assignment of a confidence assessment rating.

Id.

The RFP defined the performance confidence assessment rating as the Air Force's assessment of its confidence regarding the "offeror's ability to successfully accomplish the proposed effort based on the offeror's demonstrated present and past work record." AR 81. The RFP explained that, "considering the offeror's respective role and its work in [the] aggregate as well as the critical subcontractor(s) role, pursuant to the definition of critical subcontractor, and its work in [the] aggregate, a confidence assessment rating will be assigned for the team as a whole." AR 372; see also AR 414.

The RFP explained that on the basis of the "recency, relevancy, and quality assessments" of the evaluated contracts, the Air Force would assign each offeror an overall performance assessment rating of substantial confidence, satisfactory confidence, limited confidence, no confidence, or unknown confidence. AR 81-83. The RFP defined each rating as follows:

| RATING | DEFINITION |
|---|---|
| SUBSTANTIAL CONFIDENCE | Based on the offeror's performance record, the Government has a high expectation that the offeror will successfully perform the required effort. |
| SATISFACTORY CONFIDENCE | Based on the offeror's performance record, the Government has an expectation that the offeror will successfully perform the required effort. |
| LIMITED CONFIDENCE | Based on the offeror's performance record, the Government has a low expectation that the offeror will successfully perform the required effort. |
| NO CONFIDENCE | Based on the offeror's performance record, the Government has no expectation that the offeror will be able to successfully perform the required effort. |
| UNKNOWN CONFIDENCE | No performance record is identifiable or the offeror's performance record is so sparse that no confidence assessment rating can be reasonably assigned. |

AR 83. The RFP stated that the confidence rating would serve as a basis for evaluating competing offers. AR 82.

With regard to pricing, the RFP stated that the Air Force would evaluate proposed prices for "reasonableness and balance" and calculate a total evaluated price for each proposal. AR 83. Specifically, the RFP stated:

The existence of adequate price competition is expected to support a determination of reasonableness. Price analysis techniques may be used to further validate price reasonableness. If adequate price competition is not obtained and/or if price reasonableness cannot be determined using price analysis of Government obtained information, additional information in accordance with FAR 15.4 may be required to support the proposed price.

AR 83.

**Submission of Offers**

By April 29, 2010, the Air Force had received six proposals and had determined that three -- those submitted by Damar AeroSystems ("Damar"), Patriot, and Tactical -- were technically acceptable.  AR 469, 478.  The Air Force assembled a Performance Confidence Assessment Group ("PCAG") to review Damar's, Patriot's, and Tactical's past and present performance information and to assign performance confidence assessment ratings in accordance with the RFP.  AR 473.  The PCAG summarized its findings in the Performance Report.  See generally AR 412-49.

**The Evaluation of Patriot's Past and Present Performance**

Patriot submitted past and present performance information for one of its contracts and for several contracts of its critical subcontractor.  AR 437-38.  For each effort, the Air Force explained why it assigned the particular relevancy rating.  See, e.g., AR 431, 438-39, 474-75.

In the Performance Report, the Air Force explained that Patriot's designated contract was determined to be "technically very relevant" because it involved the production, installation, and testing of over 500 LED lights -- the type of lights required by the EALS II contract.  AR 437-38.  However, "because the effort encompassed a significantly smaller scope than the instant EALS II requirement in that it had a seven-month period of performance [for a] $7.7 [million] contract, the overall relevancy rating was determined to be somewhat relevant."  AR 438.  The Air Force noted that Patriot "did not show the capability to manage the logistical, programmatic, and contractual requirements associated with a long-term, high-dollar production effort."  AR 439.

Patriot initially submitted four efforts of its critical subcontractor, but pursuant to the RFP, only three of these efforts were considered at the outset.  AR 438.  The first effort -- a contract to provide 500 LED lights over three years for an estimated value of $3 million -- was found to be "very relevant" from a technical standpoint.  AR 431, 438, 474-75.  However, the Air Force explained that, "[w]hen taking into account the scope and magnitude characteristics," the effort could only be rated "relevant" because the effort involved an estimated 500 LED fixtures, an estimated value of $3 million, and a three-year period of performance as compared to the 24,428 LED fixtures, six-year period of performance, and estimated value of $44 million of the EALS II contract.  AR 438.

The second effort of Patriot's critical subcontractor was "determined to be technically relevant as it involved the production, installation, and testing of 112 portable LED airfield lighting fixtures."  Id.; see also AR 433.  The Air Force rated the effort as "somewhat relevant" because the "effort could not be determined [to be] very relevant as the quantities produced were not over 200" and because "this was not a long-term, high dollar contract; performance took place over a six-month period, and the contract value was $300 [thousand]."  AR 438.  The Air Force deemed the last two efforts "not relevant" based on the "lack of production and installation of light fixtures."  AR 434-35.

Because the third submitted effort of Patriot's critical subcontractor was rated "not relevant," the Air Force considered Patriot's fourth effort, which was also rated "not relevant." AR 1484.  As a result, the Air Force issued Evaluation Notice ("EN") P-P-1, which informed Patriot of the relevancy ratings of its one effort as well as the relevancy ratings assigned to the submitted efforts of its critical subcontractor.  AR 435.  EN P-P-1 also advised Patriot that it could submit additional efforts for those rated "not relevant" and that should Patriot possess additional information that might impact Patriot's relevancy ratings and confidence determination, it could also submit that information.  Id.

In response to EN P-P-1, Patriot provided two additional efforts for consideration, but only one was considered.  AR 438.  This effort -- an active and ongoing contract which began in 2004 -- was rated "very relevant" because it involved the production, installation, and testing of approximately 15,000 to 18,000 LED airfield lighting fixtures over a six-year (to date) period of performance at a value of $20 million.  AR 436 (indicating that the period of performance was "2004-Present (estimated end date in 2016)"); see also AR 438, 1515-16 (listing the period of performance as "2004-ongoing" and noting that to date, 10,000 lighting fixtures had been installed and that the contract was active).  The customer for this effort pointed out various strengths of the critical subcontractor, including responsiveness and on-time delivery, but also noted one weakness:  "the correctness of the product when first produced."  AR 438.

## The Evaluation of Tactical's Past and Present Performance

Tactical submitted past and present performance information for three of its contracts and three contracts of its critical subcontractor.  AR 440.  The first contract involved an ongoing effort to produce 1,988 incandescent light fixtures on a military airfield for the Taiwan Air Force.  AR 440, 475-76.  The contract, which was valued at $11.2 million, began in April of 2009, and was scheduled to conclude in April of 2012.  Id.  Although the scope and value of this contract were large, the Air Force rated it as "relevant" because the light fixtures delivered were incandescent, not LED.  AR 440.

The second effort submitted by Tactical involved the production and installation of 663 incandescent light fixtures on a military airfield over a period of 13 months -- February of 2006 to March of 2007 -- at a total value of $1.7 million.  AR 441.  The Air Force determined that the effort was "somewhat relevant" because it did not involve the production of LED lights.  Id.  The third effort did not involve the production and installation of light fixtures and was therefore rated "not relevant."  AR 442.  The Air Force concluded that Tactical had "shown the capability to manage the logistical, programmatic and contractual requirements associated with long-term, high dollar production efforts relevant to this instant acquisition."  AR 448.

Tactical also submitted three efforts of its critical subcontractor.  AR 442-43.  The first effort involved a Cooperative Research and Development Agreement ("CRADA") under which the critical subcontractor produced, tested, and installed 76 LED lights between January and December of 2005.  AR 442.  "There was no money involved because the effort was a CRADA." AR 442.  Because the quantity of LED lights was less than 100, the effort was rated "not relevant."  AR 443.  The second effort, which was considered a second phase to the CRADA, involved 90 LED lights at a price of $199,983 and was performed between October and

December of 2005.  Id.  Tactical represented that "[t]his effort involved the exact same lighting technology required by the EALS II."  AR 2006-07.  The customer feedback received on this effort "showed all exceptional ratings for all performance areas."  AR 444.  The Air Force observed that if reviewed on a stand-alone basis, this effort would be rated not relevant because of the small number of light fixtures produced.  AR 443.  Because the Air Force concluded that "these two efforts [were] so related that one [was] a direct follow-on of the first" and because the purchase order was "part of the CRADA effort according to the customer," the Air Force considered quantities and overall work involved in the CRADA with the purchase order.  AR 443, 447.  The Air Force rated these two efforts, collectively, as "somewhat relevant" because even considered in the aggregate, the scope and magnitude of the contracts were much smaller than the EALS II contract.  Id.  The third effort was rated "not relevant" because it did not involve production, installation, or testing.  AR 444; see also AR 447.

**The Air Force's Relevancy Ratings**

After evaluating the past and present performance information that Damar, Patriot, and Tactical had submitted, the Air Force assigned the following relevancy ratings to each of the submitted contracts that it had reviewed:

| RELEVANCY RATINGS | PATRIOT | TACTICAL |
|---|---|---|
| **Offeror's Past and Present Performance Relevancy Ratings** | Somewhat Relevant | Relevant<br><br>Somewhat Relevant<br><br>Not Relevant |
| **Critical Subcontractor's Past and Present Performance Relevancy Ratings** | Relevant<br><br>Somewhat Relevant<br><br>Not Relevant<br><br>Not Relevant<br><br>Very Relevant | Somewhat Relevant<br><br>Not Relevant<br><br>Not Relevant |

AR 436, 474-76.  Based on these relevancy ratings, the Air Force assigned Patriot's proposal and Tactical's proposal the same overall performance confidence assessment rating of "satisfactory confidence," reflecting the Air Force's expectation that each offeror would successfully perform the contract.  AR 437, 448.[3]

---

[3] Damar's proposal received an overall performance confidence assessment rating of "limited confidence."  AR 427, 474.

**Pricing Analysis**

The Air Force compared the line item pricing found in each technically acceptable proposal and considered each proposal's initial total evaluated price.  AR 450-67, 477-78. Patriot's proposal had an initial total evaluated price of $[            ].  AR 450.[4]  By comparison, Tactical's proposal had an initial total evaluated price of $64,440,029.  AR 450, 477.  Damar's initial total evaluated price was $[            ].  Id.

Due to the pricing disparity, the Air Force sent an evaluation notice to the three offerors, advising them to reexamine their proposals and the RFP and to correct any errors and/or confirm their pricing.  AR 454-57, 1489.  EN PR-P-2 stated in pertinent part:

> The Government's analysis of the offers received indicates that there is a disparity in prices.  For each CLIN/SubCLIN, please re-examine
>
> > Purchase Description PD08WRGBGBEA15, dated 4 February 2010, through Revision 2, dated 14 Apr 2010, Statement of Work dated 28 Dec 09, all DD Form 1423s attached to the RFP, and its pricing in the Schedule of the RFP
>
> for both understanding and accuracy so as to ascertain if errors have been made. Offerors shall review their escalation for the option years and verify pricing.  If an error is discovered, submit the replacement page(s) to the Schedule of the RFP/Proposal.  If no error(s) has been made, offerors shall confirm their prices.

AR 457, 1489.

In response to this request, Patriot emailed the Air Force on May 21, 2010, and asked, "[c]ould you be more specific about the disparity [in] the findings?  Is it one specific instance or multiple instances?"  AR 1494.  The Air Force replied, "[w]e are not pointing to any specific CLIN/SubCLIN; however, we are asking that all offerors review the requirements for understanding and that no errors were made in the pricing."  AR 1496.  Patriot responded:

> I realize you can't share pricing information between offerors, but is it fair to say that the disparity is an issue that one offeror has proposed pricing for some CLINs that is either much lower or much higher than the other offerors?  In this case the Government has issued the EN to allow all offerors to review their pricing to be sure they have accounted for all of the tasks and effort needed to complete each CLIN or Sub CLIN.  Is this a correct interpretation?

---

[4]  Elsewhere, the record indicates that Patriot's initial total estimated price was $[            ].  AR 477.

AR 1500.  The Air Force replied, "[y]our interpretation is correct."  AR 1503.  After this exchange, Patriot confirmed its pricing and provided "background information on the methodology used to create the pricing structure submitted for the RFP." AR 1532.  Tactical also confirmed its pricing.  AR 2122.  Due to errors discovered upon reexamination, Damar increased its total evaluated price to $[        ].  AR 478.

The total evaluated prices and the performance confidence ratings of the final proposal revisions were:

| OFFEROR | PRICE | CONFIDENCE ASSESSMENT |
|---------|-------|----------------------|
| Damar | $[        ] | Limited Confidence |
| Patriot | $[        ] | Satisfactory Confidence |
| Tactical | $64,440,029 | Satisfactory Confidence |

See AR 479.

Based on these findings, the Air Force determined that each offeror's proposed pricing was balanced and that each offeror's pricing was reasonable because multiple offers were submitted independently, which suggested that adequate price competition existed.  AR 460-61.

On August 5, 2010, the Air Force awarded the contract -- No. FA8533-10-D-0010 -- to Tactical.  AR 482.  In support of this decision, the Source Selection Authority ("SSA") cited the RFP's provision that price would be an important consideration in the best value determination.  AR 479-80.  The SSA selected Tactical because Tactical's proposal received the same performance confidence assessment rating as Patriot's proposal, but Tactical offered to perform the EALS II contract for a significantly lower price.  Id.  As such, the SSA determined that Tactical's proposal provided the best value to the Air Force.  Id.

**GAO Decision**

After receiving a written debriefing, Patriot filed an agency protest on August 10, 2010.  AR 1783-85, 1788-89.  The Air Force denied Patriot's protest, and on August 27, 2010, Patriot filed a protest with the United States Government Accountability Office ("GAO").  On November 9, 2011, GAO notified the parties of its intent to deny the protest.  Mar. 1, 2011 Hr'g Tr. at 42.  On December 6, 2010, GAO issued a decision, denying the protest on the merits, and this decision was released publicly on December 27, 2010.  Patriot Taxiway Indus., Inc., B-403690, Dec. 6, 2010, 2010 CPD ¶ 291; Mar. 1, 2011 Hr'g Tr. at 32.

On February 28, 2011, Patriot filed the instant action.  On March 1, 2011, the Court heard argument on Patriot's application for a temporary restraining order ("TRO") and orally denied the TRO application.  On April 11, 2011, this Court denied Patriot's motion for a preliminary

injunction.  Pending before the Court are Patriot's motion for permanent injunctive relief and Defendant's and Tactical's motions for judgment on the AR.

## Discussion

### Jurisdiction and Standard of Review

The Court has jurisdiction over this bid protest pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1).  In a bid protest, the Court reviews an agency's procurement decision under the standards enunciated in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4); see also Ala. Aircraft Indus., Inc. v. United States, 586 F.3d 1372, 1373 (Fed. Cir. 2009); Gentex Corp. v. United States, 58 Fed. Cl. 634, 648 (2003).  Pursuant to the APA, this Court may set aside an agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); Ala. Aircraft Indus., 586 F.3d at 1373; Gentex, 58 Fed. Cl. at 648.

The Court will find an agency action to be arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Ceres Envtl. Servs., Inc. v. United States, 2011 U.S. Claims LEXIS 429, at *76-77 (Fed. Cl. Feb. 28, 2011) (citing Ala. Aircraft Indus., 586 F.3d at 1375 (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983))).  Contracting officers are afforded considerable discretion in negotiated procurements, such as this one, where award is premised on a "best value" determination.  Id. at *77 (citing Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1355 (Fed. Cir. 2004)).  Such discretion, however, "does not relieve the agency of its obligation to develop an evidentiary basis for its findings."  Id. (quoting In re Sang Su Lee, 277 F.3d 1338, 1344 (Fed. Cir. 2002)).  Indeed, it is well established that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  Id. (quoting Motor Vehicle, 463 U.S. at 43).  A court may not substitute its judgment for that of the agency, but rather must confine its review to determining whether the agency's decision was arbitrary and capricious.  Motor Vehicle, 463 U.S. at 43; Eskridge Research Corp. v. United States, 92 Fed. Cl. 88, 97 (2010).

To obtain permanent injunctive relief, a Plaintiff must show: (1) actual success on the merits; (2) it will suffer irreparable harm absent injunctive relief; (3) the balance of hardships tips in its favor; and (4) an injunction will serve the public interest.  See PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004); AshBritt v. United States, 87 Fed. Cl. 344, 365 (2009).

**The Grounds for Patriot's Protest**

Patriot challenges the award on the following grounds:

- The Air Force failed to evaluate past performance in accordance with the RFP by aggregating consecutive but non-concurrent contracts, which led to one effort of Tactical's critical subcontractor receiving a rating of "somewhat relevant" and to Tactical obtaining a performance confidence assessment rating of "satisfactory confidence";

- In evaluating past and present performance, the Air Force improperly considered future performance;

- The Air Force assigned inconsistent weights to the determination of relevancy ratings for contracts included in the two proposals and assigned the same performance confidence assessment rating to Patriot and Tactical, despite differences in the relevancy of the contracts included in their respective proposals;

- The Air Force failed to document its determination of the performance confidence assessment ratings;

- The Air Force failed to conduct a proper price reasonableness analysis; and

- The Air Force's discussions with Patriot regarding pricing disparities were misleading and not meaningful.

**Evaluation of Past and Present Performance**

Patriot alleges that the Air Force improperly aggregated the number of airfield light fixtures that Tactical's critical subcontractor produced under two efforts that were presented separately in Tactical's proposal.  Patriot argues that the second contract was a follow-on to the first and that the contracts should not have been aggregated because they were performed consecutively, not concurrently.  According to Patriot, the Air Force's improper aggregation led to Tactical's critical subcontractor receiving a rating of "somewhat relevant" on one contract, which led the Air Force to assign Tactical's proposal a performance confidence assessment rating of "satisfactory confidence" -- the same rating that Patriot's proposal received.

The RFP expressly permitted the Government to "consider an offeror's contracts in the aggregate in determining relevancy should the offeror's present and past performance lend itself to this approach. . . . when these contracts are performed concurrently (in whole or in part)." AR 82, 372.  Further, the RFP specified that when such contracts "are assessed in the aggregate, the work may more accurately reflect a higher relevancy rating."  Id.  Here, the periods of performance in these two contracts overlapped between October 1, 2005, and October 15, 2005, so the Air Force's aggregation of the two efforts was reasonable.  See AR 445; AR 2002; Pl.'s Reply at 2.

Patriot further argues that the Air Force improperly considered future performance in Tactical's Taiwan Air Force contract because that contract was ongoing and Tactical had only performed one-third of the work. Patriot contends that the RFP included no provision that would allow future, promised and speculative performance to be reasonably included in the offeror's present and past work record. Pl.'s Reply at 3-4. However, Patriot itself submitted an ongoing active contract, estimated to end in 2016, as a reference for its critical subcontractor's performance. AR 436.

Because the RFP permitted the Air Force to evaluate "present" experience and "ongoing" efforts, the Air Force's evaluation of Tactical's Taiwan Air Force contract was reasonable. See AR 367. Tactical had been performing the Taiwan Air Force contract for more than a year when the proposals were evaluated. The Air Force confirmed that Tactical was performing satisfactorily and had delivered three of the nine airfield light systems under that contract. See AR 440-41. With regard to Tactical's performance of the Taiwan Air Force contract, the Performance Report stated:

> The customer representatives reported that Tactical was the ultimate professional in its work and its customer service. Exceptional ratings were given in the areas of: the extent to which the company's products met contractual requirements; the level of workmanship and quality in the products; the company's proficiency in processing the customer's order and timely deliveries' [sic] and, the company's knowledge and proficiency with industry standards and specifications. . . . The customer noted that [Tactical] had never provided late deliveries . . . .

AR 440-41. Thus, although portions of the Taiwan Air Force contract had not yet been performed, the Air Force had an ample basis to consider Tactical's performance under this contract as of the evaluation. It was reasonable for the Air Force to factor both the magnitude of this ongoing contract and the quality of performance into its assessment.[5]

Patriot asserts that one of its contracts was more relevant than Tactical's Taiwan Air Force contract. The Air Force rated this Patriot contract as "somewhat relevant" because it involved only 500 LED fixtures as compared to the 24,428 lighting fixtures required by the

---

[5] Patriot claims that in assessing relevancy the Air Force should have not have considered the total price of Tactical's Taiwan Air Force contract because a modification raising the price from roughly $8.3 million to $11.2 million had nothing to do with providing the portable airfield lighting system and instead entailed provision of 19 Mercedes Benz military vehicles. Pl.'s Reply at 4-5. However, Tactical was required to describe any changes in the dollar value and performance period of its reference contracts from the time of award until the time of its offer in the EALS II procurement. AR 87. As such, the Air Force was permitted to utilize this updated price in evaluating the effort. Moreover, the record does not reflect that the Air Force deemed the additional $3 million in the overall price of the Taiwan Air Force contract to be determinative either in rating the contract "relevant" or in assigning an overall "satisfactory confidence" rating to Tactical's proposal. Rather, in explaining the "relevant" rating for the Taiwan reference, the PCAG focused on the fact that the contract "involved the production and installation of 1,988 incandescent lights fixtures for use on a military airfield" and had received a positive customer review. AR 440, 447.

EALS II contract, the contract's performance period was seven months as compared to six years, and the contract's estimated value was $7.7 million as compared to the $44 million estimated value of the EALS II contract.  AR 430.  The Air Force reasonably determined that Tactical's Taiwan Air Force contract was more relevant than Patriot's contract given that the Taiwan effort had a longer performance period, a higher estimated value, and involved delivery of significantly more airfield light fixtures.

Patriot argues that the Air Force treated Patriot and Tactical unequally in evaluating past and present performance based upon a numerical count of relevancy ratings.  Patriot points out that it received one "somewhat relevant" rating for its effort, and the efforts of its critical subcontractor received one rating of "very relevant," another of "relevant," and a third of "somewhat relevant."  AR 436, 474-75.  By comparison, Tactical received one "relevant" rating and one "somewhat relevant" rating for its referenced contracts as well as one "somewhat relevant" rating for an effort of its critical subcontractor.  AR 436, 475-76.  Despite these differences, the Air Force assigned both proposals the same overall performance confidence assessment rating of "satisfactory confidence."

Patriot's argument that its relevancy ratings necessarily warranted a higher performance confidence rating than Tactical's relevancy ratings is premised on its misconception that a confidence assessment rating had to be raised if a greater number of "very relevant" or "relevant" ratings were attained.  Basing a performance confidence assessment on a rote counting of the number of relevancy ratings was not what the RFP envisioned.  Rather, under the RFP, confidence ratings were to be assigned based upon an assessment of the overall past and present performance, taking into account recency, relevancy, and quality.  The broad category of "satisfactory confidence" could reasonably be applied to a differing array of relevancy ratings depending on the characteristics of the efforts involved.  Here, both offerors were given satisfactory confidence ratings, which meant that the Government had an expectation that each offeror would successfully perform the required effort.  The record fully supports this expectation.

Patriot further contends that Patriot's designated efforts should have been assigned at least two ratings of "very relevant," without adequately articulating which efforts should have received higher ratings or why.  Pl.'s Mem. at 12-13.  In so arguing, Plaintiff is asking the Court to step into the shoes of the Air Force evaluators and assess past and present performance.  As recognized in Ashbritt, this Court does not sit as a super source selection authority to second guess and re-score offerors' proposals.  Ashbritt, 87 Fed. Cl. at 367 (citing R&W Flammann GMBH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003)).  In particular, the evaluation of offerors' past performance is generally within the agency's broad discretion.  Vantage Assocs., Inc. v. United States, 59 Fed. Cl. 1, 22 (2003) (stating that an agency has broad discretion when evaluating past performance); see also Clean Harbors Envtl. Servs., Inc., B-296176.2, Dec. 9, 2005, 2005 CPD ¶ 222 at *2.  In any event, Patriot's mere disagreement with the Air Force's evaluation is insufficient to establish that the Air Force's actions were unreasonable.  See CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 380-81 (2010).

## Documentation of Patriot's Performance Confidence Assessment Rating

According to Patriot, the Air Force failed to document how it assigned a performance confidence assessment rating to the offerors based on the relevancy ratings.   As Patriot argues:

> In reaching these ratings, the procurement documentation discusses at length the relevancy of the contracts and other past performance information submitted with the offers, but provides no explanation as to why a particular performance confidence rating was chosen as opposed to the other performance confidence ratings.  Explanation of the final, critical step is missing.

Pl.'s Mem. at 14.

The Air Force justified its assignment of a performance confidence rating of "satisfactory confidence" to Patriot as follows:

> On the effort determined to be somewhat relevant, [Patriot] . . . demonstrated technical relevancy to EALS II, but did not show the capability to manage the logistical, programmatic, and contractual requirements associated with a long-term, high-dollar production effort.  On the one very relevant, one relevant, and one somewhat relevant efforts, [Patriot's critical subcontractor] demonstrated that it can design, test, produce, and install lighting components with the same technical relevancy to EALS II. . . . Considering that the prime contractor itself offers somewhat relevant experience and its proposed critical subcontractor brings to the relationship very relevant to somewhat relevant experience, there is a satisfactory expectation that Patriot Taxiway Industries will be able to successfully perform the work required in the EALS II program.

AR 439; see also AR 437-38.  The Air Force provided a similar explanation of the basis for Tactical's performance confidence rating.   AR 447-48.  These explanations belie Patriot's assertion that the Air Force did not document how it decided to assign a particular performance confidence rating.

In rejecting an argument similar to that which Patriot makes here, the court in Precision Images, LLC v. United States explained:

> The court does not adopt Precision's narrow construction of the [Source Selection Decision Document ("SSDD")] decision page.  Rather, the court finds that the SSDD's decision page is not separate and distinct from the discussion immediately preceding it.  Although the decision page does not specifically mention any of [the awardee's] advantages or strengths and, in fact, constitutes only three paragraphs, it did not need to do so.  Rather, the decision page represents the culmination of seven pages of detailed analysis of and findings related to the three offerors' proposals.  Within those seven pages are individual present and past performance and cost/price evaluations for each offeror.  The language of the SSDD is virtually identical to the findings contained in the PCAG

final performance report, and it is apparent that the SSDD incorporated the PCAG's conclusions. . . . A review of the entire SSDD supports this conclusion. The SSDD incorporated [the awardee's] strengths or advantages into its discussion of [the awardee's] proposal, thereby rendering it unnecessary and redundant to reiterate a summary of those findings in the decision page. . . . Precision's argument that these findings are absent from the agency's decision page ignores the totality of the SSDD.

79 Fed. Cl. 598, 621-22 (2007) (internal citations omitted).  Here, as in <u>Precision Images</u>, the agency adequately explained why it assigned Patriot and Tactical performance confidence assessment ratings of "satisfactory confidence."

## Price Reasonableness

Patriot also asserts that the Air Force's price reasonableness determination was improper because it relied solely upon the existence of adequate price competition.  The purpose of a price reasonableness analysis is to prevent the Government from paying too high a price for a contract. <u>See e.g.</u>, <u>Ceres</u>, 2011 U.S. Claims LEXIS 429, at *79 n.15; <u>DMS All-Star Joint Venture v. United States</u>, 90 Fed. Cl. 653, 663 n.11 (2010).  Where, as here, a firm-fixed price contract is anticipated, an agency "may use various price analysis techniques and procedures to ensure a fair and reasonable price," including the comparison of proposed prices received in response to a solicitation.  FAR 15.404-1(b)(2)(i); <u>see also</u> <u>Comprehensive Health Servs., Inc.</u>, B-310553, Dec. 27, 2007, 2008 CPD ¶ 9 at *7.  The Air Force determined that adequate price competition existed because multiple proposals were submitted independently of each other.  AR 461.  This approach was not erroneous.  The RFP expressly provided that "[t]he existence of adequate price competition is expected to support a determination of reasonableness" and "[p]rice analysis techniques may be used to further validate price reasonableness."  AR 83.  As this Court recognized in <u>Ceres</u>, "[n]ormally, competition establishes price reasonableness."  <u>Ceres</u>, 2011 U.S. Claims LEXIS 429, at *79-80; <u>see</u> <u>Comprehensive Health Servs.</u>, 2008 CPD ¶ 9 at *7 (stating that "[a]gencies may rely upon adequate price competition alone to assess price reasonableness").

According to Patriot, because of the drastic variance among the Air Force's total program estimate of $44.1 million and the competitive offerors' total evaluated prices, the Air Force's reliance on "adequate price competition" to establish price reasonableness was arbitrary, capricious, and an abuse of discretion.  However, when the Air Force's pricing analysis revealed pricing disparities, the Air Force requested that these offerors re-examine their proposals and the RFP's requirements to confirm or adjust their pricing.  This request for re-examination was eminently rational and ensured that no offeror had made a mistake in its pricing.  As the Air Force concluded, "[a]ll ENs for all Offerors were answered satisfactorily and are considered to be closed. . . . Adequate price competition exists."  AR 460-61.

To the extent Patriot alleges that Tactical's price was unreasonably low, Patriot challenges the realism of that price.  <u>See, e.g.</u>, <u>Ceres</u>, 2011 U.S Claims LEXIS 429, at *79-81; <u>DMS</u>, 90 Fed. Cl. at 663 n.11.  As this Court recognized in <u>Ceres</u>, "[i]n a fixed-price procurement, the agency ordinarily does not consider the 'realism' of offerors' proposed prices

because the contractor bears the risk of underpricing its offer." 2011 U.S. Claims LEXIS 429, at *80 (citations omitted). Here, as in <u>Ceres</u>, the Air Force entered into discussions to ensure that offerors' prices were accurate. Then, after confirming prices and recognizing that the contract was a fixed-price contract with the risk of an unrealistically low price falling on the contractor, the Air Force proceeded to award to Tactical with "its eyes wide open." <u>See</u> <u>Ceres</u>, 2011 U.S. Claims LEXIS 429, at *93. Patriot has not established that the Air Force's action in awarding to the low-priced, technically acceptable contractor was arbitrary or capricious.

**<u>The Air Force's Discussions with Patriot</u>**

Patriot claims that the Air Force's discussions were misleading and not meaningful because they led Patriot to believe that the Air Force suspected that Patriot had omitted costs or failed to contemplate all of the RFP's requirements. Patriot asserts that the Air Force was obligated to convey what Patriot claims should have been the Air Force's concern, <u>i.e.</u>, that Patriot's pricing was nearly [    ] times the Air Force's estimate.

Although the precise content of discussions is largely a matter of the contracting officer's judgment, generally discussions must address weaknesses or deficiencies in an offeror's proposal that, unless corrected, would preclude award. <u>See, e.g.</u>, <u>Ceres</u>, 2011 U.S. Claims LEXIS 429, at *104. An agency is not obligated to indicate every way that an offeror's proposal could be strengthened. <u>See</u> <u>Dynacs Eng'g Co. v. United States</u>, 48 Fed. Cl. 124, 131 (2000).

Where, as here, the proposed price is considered acceptable and reasonable, an agency is not required to discuss the issue at all. <u>See, e.g.</u>, <u>Ceres</u>, 2011 U.S. Claims LEXIS 429, at *103-05; <u>Dynacs Eng'g Co.</u>, 48 Fed. Cl. at 132 ("[B]ecause [the agency] determined that the offeror's . . . price/cost were acceptable . . . [that point] did not require discussion."). "[U]nless an offeror's costs constitute a significant weakness or deficiency in its proposal, the contracting officer is not required to address in discussions costs that appear to be higher than those proposed by other offerors." <u>Ceres</u>, 2011 U.S. Claims LEXIS 429, at *104 (quoting <u>DMS</u>, 90 Fed. Cl. at 669) (citation omitted). "FAR § 15.306(e)(3) gives the contracting officer discretion to inform an offeror that 'its price is considered by the Government to be too high or too low.' But neither that provision, nor any other, requires the contracting officer to discuss a proposed price that . . . is not considered a significant weakness or deficiency." <u>Electronic Data Systems, LLC v. United States</u>, 93 Fed. Cl. 416, 434 (2010).

**<u>Patriot is Not Entitled to Permanent Injunctive Relief</u>**

To obtain permanent injunctive relief, Patriot must show that: (1) it has succeeded on the merits of the case; (2) it will suffer irreparable harm absent injunctive relief; (3) the balance of hardships tips in its favor; and (4) an injunction will serve the public interest. <u>See</u> <u>PGBA</u>, 389 F.3d at 1228-29; <u>AshBritt</u>, 87 Fed. Cl. at 365. Here, Patriot has not succeeded on the merits of its case -- a circumstance which in and of itself defeats Patriot's request for injunctive relief. <u>See, e.g.</u>, <u>Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.</u>, 357 F.3d 1319, 1325 (Fed. Cir. 2004); <u>Int'l Res. Recovery, Inc. v. United States</u>, 64 Fed. Cl. 150, 164 (2005) ("A plaintiff that cannot show that it will actually succeed on the merits of its claim cannot prevail on its motion for injunctive relief."); <u>Info. Tech. & Applications Corp. v. United States</u>, 51 Fed. Cl. 340, 357 n.32

(2001) ("Absent success on the merits, the other factors are irrelevant."), aff'd, 316 F.3d 1312 (Fed. Cir. 2003).  As the Federal Circuit has explained:

> Although in some instances [the factors for injunctive relief], taken individually, are not dispositive because the district court's conclusion results from a process of overall balancing, a movant is not entitled to a preliminary injunction if he fails to demonstrate a likelihood of success on the merits.   In other words, a court cannot use an exceptionally weighty showing on one of the other three factors to grant a preliminary injunction if a movant fails to demonstrate a likelihood of success on the merits.

Nat'l Steel Car, 357 F.3d at 1325 (internal citations omitted).  Given Patriot's lack of success on the merits, injunctive relief is unwarranted.

## Order

1.  Defendant's Motion for Judgment on the Administrative Record is **GRANTED**.

2.  Intervenor's Motion for Judgment on the Administrative Record is **GRANTED**.

3.  Plaintiff's Motion for a Permanent Injunction and request for declaratory relief are **DENIED**.

4.  Prior to the release of this opinion to the public, the parties shall review the opinion for competition-sensitive, proprietary, confidential or other protected information.  The parties shall file proposed redacted versions of this decision or, in the alternative, file a notice indicating the party's intent not to file proposed redactions, on or before **May 2, 2011**.

5.  The Clerk is directed to enter judgment on the Administrative Record in favor of Defendant and Intervenor consistent with this opinion.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**